IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GRAY MOTOROLA CELL PHONE SEIZED FROM KATIE CURTIS AND CURRENTLY IN EVIDENCE AT THE STRAFFORD COUNTY SHERIFF'S OFFICE | Case No. __24-mj-285-01-TSM__ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Deputy John Forbes, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been employed in law enforcement for approximately 17 years. My current assignment is with the Strafford County Sheriff's Office as a detective within the Investigations unit. I am currently a Task Force Officer ("TFO") for Homeland Security Investigations ("HSI") in the Manchester, New Hampshire Office.  During this assignment I have participated in multiple intrastate and interstate narcotics investigations.  Prior to this assignment, I was a member of the New Hampshire State Police Narcotics Investigations Unit. Prior to working at the Strafford County Sheriff's Office, I was employed by the Exeter, NH Police Department, and the New Hampshire State Police. I held the positions of Officer, Trooper, and Detective during my tenure with these two departments. I successfully graduated from the 145th New Hampshire Police Standards and Training Full-Time Police Academy in 2008.

2.      From my training and experience, I have personally observed the sale and possession of various controlled substances including, but not limited to, marijuana, cocaine, cocaine base ("crack" cocaine), heroin, fentanyl, and methamphetamine.  I am

familiar with the types of packaging used to distribute controlled substances, as well as equipment used such as scales, bags, and cutting agents. I am familiar with equipment used to ingest and use controlled substances, such as needles, syringes, and smoking pipes. I have also learned the preferred methods of ingestion of various controlled substances such as smoking, injecting, snorting/ inhaling, along with dose sizes.  I know that drug traffickers use counter-surveillance techniques to avoid detection.  These techniques include operating or using several vehicles or vehicles registered in other people's names and the use of stash houses or alternate locations to store and hide drugs and assets.  Also, I have learned the methods of distribution of controlled substances such as marijuana, cocaine, crack cocaine, heroin, fentanyl, and methamphetamine. I have further learned through my training and experience that those subjects involved in the illegal distribution of narcotics have ties to other illegal crimes that involve money laundering, fraud and other deceptive behaviors.  I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations.  I also stay current on the latest technology used to investigate drug crimes.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

## <u>PURPOSE OF AFFIDAVIT</u>

4.      I submit this affidavit in support of an application for a warrant to search the following cellular phone:

a.  A gray Motorola flip-style cellular phone, which was located in Katie Curtis's possession on October 16, 2024, when CURTIS was arrested in Rochester, NH on a federal warrant. The cell phone is currently in the custody of the Strafford County Sheriff's Office at 259 County Farm Road, Dover, NH.

5.      Based on the information contained herein, there is probable cause to believe that the Target Phone, described in Attachment A, contains evidence, fruits, and instrumentalities of distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 as described in Attachment B.

6.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

7.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

# PROBABLE CAUSE

## Background to Investigation

8.　　Starting in February of 2022, members of the Strafford County Sheriff's Office Problem Oriented Policing Unit ("SCSO-POP") have been conducting several investigations into the illegal sale of narcotics by individuals in the Rochester and Dover, NH area. In the months that followed, SCSO-POP conducted several controlled purchases and seizures of fentanyl, cocaine, crack cocaine, and methamphetamine. Further, the SCSO-POP Unit obtained and executed several search and arrest warrants related to these investigations.

9.　　As part of the aforementioned enforcement activity, SCSO-POP, along with other law enforcement agencies, conducted interviews with suspected narcotics distributors and received information from various sources, including confidential sources ("CS"s) about narcotic activities, such as sources of supply, phone numbers, "runner" vehicles, and financial information of larger distributors.

10.　　By analyzing the above information, SCSO-POP and Homeland Security Investigations ("HSI") (collectively, "law enforcement") identified Michael MARTINEZ as a large source of supply of fentanyl, cocaine, and methamphetamine to the Seacoast area of New Hampshire and Maine. MARTINEZ's DTO is based in the Lawrence, MA area. Through investigative methods, including direct messages from MARTINEZ to an HSI Undercover Agent ("HSI UCA") discussing where he is based, law enforcement has been able to determine that MARTINEZ is operating his DTO from the Dominican Republic.

11.　　Through investigative methods including but not limited to controlled purchases, surveillance, and source debriefs, law enforcement is aware that the MARTINEZ DTO utilizes "runners" to transport narcotics from Lawrence, MA to Southern and Northern, NH and Maine.

Once the MARTINEZ DTO receives an order for narcotics, MARTINEZ will then communicate that order to his runners in Lawrence and instruct the runners where to deliver the requested amount of narcotics and how much money the runner should collect for the order. The runners deliver to various sub-distributors located throughout New Hampshire.

12.     On October 9, 2024, a federal grand jury in the District of New Hampshire returned an indictment charging ten individuals with participating in a conspiracy to distribute controlled substances. The indictment included Michael MARTINEZ, who manages the DTO from the Dominican Republic, Donaida GONZALEZ, his mother who operates a suspected stash house in Massachusetts, Massachusetts-based runners Eddy Balbuena-GOMEZ, and Diana Carolina Bautista ARIAS, and New Hampshire-based sub-distributors Katie CURTIS, Craig GRANT, Jamie BONNER, Tabitha O'BRIEN, Redondo DORE, and Trevor MACKENZIE. Arrest warrants were issued for all of these defendants.

### Controlled Purchases with MARTINEZ DTO

13.     During January 2024, a confidential source ("CS#1")[1], began providing information to law enforcement on the MARTINEZ DTO.

---

[1] CS#1 is a narcotics addict who has been providing information to law enforcement in consideration for favorable treatment regarding charges including possession of a controlled drug, transporting drugs in a motor vehicle, and felonious use of a firearm.  CS#1 has a prior criminal history including narcotics and driving-related offenses. CS#1 has also been compensated approximately $1600 for cooperation in this matter. Since becoming a confidential source, CS#1 was recently charged in New Hampshire with the following: kidnapping, simple assault, robbery, and criminal threatening.  CS#1 has previously provided information in cases that resulted in the arrests of narcotics distributors and resulted in large narcotics and currency seizures.  Although CS#1 has a serious history of criminal behavior, the evidence developed from CS#1's participation in this investigation is reliable, due to the use of investigative controls, recordings, and corroboration via independent evidence.

14.     During a phone conversation between CS#1 and MARTINEZ on the night of February 20, 2024, CS#1 mentioned that CS#1 knew other customers looking for large quantities of narcotics.  On February 26, 2024, MARTINEZ contacted CS#1 and requested that CS#1 provide the contact information for these larger customers so MARTINEZ could contact them to sell them narcotics.  In response, CS#1 then provided MARTINEZ with the contact information for an HSI UCA.

15.     At approximately 11:00 pm on February 26, 2024, MARTINEZ reached out to the HSI UCA on the Signal Application. The HSI UCA began communicating with MARTINEZ, through text message and phone calls, about purchasing large quantities of fentanyl and methamphetamine. During subsequent conversations with MARTINEZ, MARTINEZ asked the HSI UCA how much "up" (cocaine) and how much "down" (fentanyl) the HSI UCA would want to order on a weekly basis.

16.     On March 3, 2024, the HSI UCA messaged MARTINEZ that they would be around the next day and have cash to purchase narcotics. MARTINEZ and the HSI UCA arranged for a narcotics transaction to take place at an address in Seabrook, NH.

17.     During the afternoon of March 4, 2024, MARTINEZ told the HSI UCA that a female was on her way to meet, and she would be driving a Toyota.  A short time later, law enforcement observed a 2006 Toyota Corolla with Massachusetts registration park next to the HSI UCA's vehicle at the meeting location in Seabrook. A Hispanic female exited the Toyota and got into the HSI UCA's vehicle.  Inside the HSI UCA's vehicle, the HSI UCA provided

$2,000 to the female runner and she provided the HSI UCA a baggie containing what laboratory analysis later confirmed to be 340.54 grams of fentanyl.[2]

18.     Following this controlled purchase, the HSI UCA arranged numerous other controlled purchases of narcotics with MARTINEZ.  The HSI UCA would communicate with MARTINEZ about the drug quantity, price, and meeting location and time for the drug transaction, and a runner would arrive at the location and provide the narcotics—generally, fentanyl—to the HSI UCA in exchange for cash.  Law enforcement identified one such runner, involved in numerous controlled purchases with the HSI UCA, to be Eddy Balbuena-GOMEZ.

**GPS Tracking of MARTINEZ DTO Runner's Vehicle Shows Stops at CURTIS's Residence**

19.     On May 2, 2024, law enforcement obtained from a magistrate judge in the District of Massachusetts a federal warrant authorizing the installation of a GPS tracking device on a vehicle belonging to GOMEZ.

20.     Following the installation of the GPS tracking device, through the use of tracker data and physical surveillance, law enforcement observed that GOMEZ's vehicle made frequent stops at a residence in Rochester, NH.  These stops included trips to the Rochester residence after making controlled purchases to the HSI UCA.

21.     Through law enforcement database searches, law enforcement confirmed that the Rochester residence described in the preceding paragraph was the residence of Katie CURTIS. In physical surveillance at the residence, investigators observed CURTIS coming and going from the residence at all hours of the day, consistent with that being her residence.

---

[2]  This transaction, like the other controlled purchases conducted by the HSI UCA described in this Affidavit, was electronically recorded.

22.     Previously, on February 20, 2024, CS#1 had advised law enforcement personnel that Katie CURTIS was a narcotics distributor in the Rochester, NH area that was obtaining large amounts of narcotics through the MARTINEZ DTO.

23.     Law enforcement observed that the stops that GOMEZ's vehicle would make at CURTIS's residence were for brief amounts of time, consistent with narcotics-related deliveries.

**Search Warrant Execution at CURTIS's Residence**

24.     On Wednesday, June 19, 2024, I applied for and was granted a state of New Hampshire search warrant for CURTIS's residence in Rochester, NH.

25.     On June 20, 2024, investigators executed the search warrant at CURTIS's residence. The search of the residence yielded various containers of controlled substances, including what laboratory analysis confirmed to be approximately 53 grams of cocaine, 14 grams of cocaine base, and 41 grams of fentanyl.  Law enforcement also seized a cellular phone belonging to CURTIS from the residence during the search.

**Search of CURTIS's Phone and MARTINEZ's Accounts Show
Evidence of Drug Distribution Conspiracy**

26.     Analysis of CURTIS's phone seized during the search of her residence revealed contacts with MARTINEZ as well as messages confirming CURTIS' narcotics distribution within New Hampshire.  In a review of the messages between CURTIS and the number known to be used by MARTINEZ, there was conversation about MARTINEZ delivering large quantities of  both fentanyl and cocaine to CURTIS and CURTIS providing money to MARTINEZ in exchange. For example, on June 15, 2024 at 8:00 pm MARTINEZ sent CURTIS a message "u good tonight?" CURTIS responded, "I need down. Good on white tonight. Have paper for you too."  I know from my training and experience that "down" is a slang term used to refer to heroin

or fentanyl, "white" is a slang term used to refer to cocaine, and "paper" is a slang term for money. In another example, on June 17, 2024, at 1:10 am, CURTIS sent a text to MARTINEZ stating "So what do I owe you now?? I gave you 4400 and u only gave me 2 Oz and ten stk." I know from my training and experience that "Oz" is an abbreviation for ounce, and "stk" is an abbreviation for a "stick," which is a 10 gram quantity of narcotics, usually heroin or fentanyl. Accordingly, I believe this text message refers to CURTIS providing money (the reference to "4400" is likely a reference to $4,400 USD) to MARTINEZ in exchange for narcotics.

27.     Separately, law enforcement conducted toll analysis on phone numbers used by MARTINEZ. That analysis showed that MARTINEZ had more than 2,000 phone contacts with CURTIS between November 17, 2023 to August 5, 2024, through multiple different phone numbers.

28.     On July 19, 2024, a search was completed on MARTINEZ's TextNow account associated with his phone numbers. A search of MARTINEZ's TextNow account revealed communications with CURTIS about delivery of large quantities of narcotics to CURTIS and the transfer of large quantities of currency from CURTIS to MARTINEZ for narcotics deliveries.

29.     Furthermore, an analysis of MARTINEZ's accounts on CashApp (a cash transfer/payment software application) showed that CURTIS had paid MARTINEZ approximately $40,000 between August 8, 2023 and July 20, 2024.

### CURTIS's Drug Activity Since the Search of Her Residence and Seizure of CURTIS's Prior Cell Phone

30.     In the weeks following the search of CURTIS's residence, tracker information from GOMEZ's vehicle showed that it was still making stops at CURTIS's residence. The stops

8

at the residence were for brief periods of time, consistent with that of the previous narcotics deliveries to the residence.

31.     Tolls and phone call analysis through MARTINEZ's TextNow account revealed that CURTIS was still using her phone number to contact MARTINEZ in the weeks following the search warrant at her residence.  In the records of MARTINEZ's TextNow account it showed that the number known to be CURTIS' through law enforcement data base searches and subscriber information, again begins contacting MARTINEZ's TextNow account on June 26, 2024. From that date until July 18, 2024, CURTIS has over 100 contacts with MARTINEZ through her phone number.

32.     On Wednesday, October 9, 2024, law enforcement personnel received information that CURTIS had moved from the residence law enforcement had searched into a local motel in Rochester, NH.  Through investigation, law enforcement confirmed the address of that motel, and the room number she was staying in.

33.     On October 16, 2024, law enforcement arrested CURTIS in connection with the October 9 federal indictment charging CURTIS and others with conspiracy to distribute controlled substances.

34.     Upon being taken into custody, I made contact with CURTIS and advised her of her Miranda Warning and rights. CURTIS advised that she understood her rights and willingly agreed to answer questions. CURTIS advised that she had been evicted from her Rochester, NH residence and that she had moved within the last week to the motel where law enforcement had confirmed she as residing.  CURTIS further provided information that she had been in contact with MARTINEZ within the last month through her cellular telephone to arrange for the delivery

of narcotics. CURTIS provided consent to search her hotel room and identified the TARGET

PHONE within that room as belonging to her.

35.     CURTIS provided the passcode to the TARGET PHONE and advised that it was

the phone that she used to contact MARTINEZ.

36.     Law enforcement seized the TARGET PHONE and secured it at the Strafford

County Sheriff's Office pending a search warrant application. The TARGET PHONE is

currently in storage at the Strafford County Sheriff's Office, 259 County Farm Road, Dover, NH.

In my training and experience, I know that the TARGET PHONE has been stored in a manner in

which its contents are, to the extent material to this investigation, in substantially the same state

as they were when the TARGET PHONE first came into the possession of the Strafford County

Sheriff's Office.

### TRAINING AND EXPERIENCE SUPPORTING PROBABLE CAUSE THAT EVIDENCE OF DRUG TRAFFICKING WILL BE FOUND ON CELLULAR PHONES

37.     Based on my training and experience, I know that drug traffickers typically use

cellular telephones in order to facilitate drug transactions, including to order and take orders for

controlled substances or to set up shipments.  I am aware that items such as cell phones are often

located in a residence or on an individual's person.

38.     Individuals involved in the illicit distribution of controlled substances often take

or cause to be taken photographs of themselves, their associates, their property and their product

and such items are usually maintained within their residence and sometimes on cell phones.

39.     Evidence of drug crimes can be found in the cell phone referenced in the

preceding paragraphs.  Such evidence can include internet searches for drug-related

paraphernalia, addresses, or telephone numbers, as well as incriminating communications via

emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, TextNow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

40.    Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

41.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.

## TECHNICAL TERMS

42.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless

11

telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

13

and a keyboard and/or touch screen for entering data.  Removable storage media
include various types of flash memory cards or miniature hard drives.  This
removable storage media can store any digital data.  Most PDAs run computer
software, giving them many of the same capabilities as personal computers.  For
example, PDA users can work with word-processing documents, spreadsheets,
and presentations.  PDAs may also include global positioning system ("GPS")
technology for determining the location of the device.

f.    Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other.  Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the same
state.

43.    I know that many smartphones like the TARGET PHONE (which are included in
Attachment B's definition of "computer hardware") can now function essentially as small
computers. Smartphones have capabilities that include serving as a wireless telephone, digital
camera, portable media player, GPS navigation device, sending and receiving text messages and
e-mails, and storing a vast range and amount of electronic data. Examining data stored on
devices of this type can uncover, among other things, evidence that reveals or suggests who
possessed or used the device. Based on my training, experience, and information provided to me
by other law enforcement personnel, I am aware that individuals commonly store records of the
type described in Attachment B in mobile phones, computer hardware, computer software, and
storage media.

14

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

44.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

45.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

15

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

46. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

47. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

48. Based on the information described above, I believe CURTIS, and others yet unknown worked together to distribute controlled substances within the District of New

16

Hampshire. Based on the information contained herein, I believe the TARGET PHONE will likely contain evidence of those violations.

49.     Therefore, I have probable cause to believe that evidence, fruits, and instrumentalities of the crime 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], as further described in Attachment B, are contained within the equipment described in Attachment A.

/s/ John T. Forbes
John T. Forbes
TASK FORCE OFFICER
U.S. DEPARTMENT OF HOMELAND SECUITY
HOMELAND SECURITY INVESTIGATIONS

Sworn to via telephone in accordance with Federal Rule of
Criminal  Procedure 4.1 on  November 1, 2024

Hon. Talesha L. Saint-Marc
United States Magistrate Judge

17

**ATTACHMENT A**

*Description of Equipment to Be Searched*

The equipment to be searched consists of the following (hereafter, the "TARGET PHONE"):

    a.  A gray Motorola flip-style cellular phone, which was located in Katie

        Curtis's possession on October 16, 2024, when CURTIS was arrested in

        Rochester, NH on a federal warrant.

The TARGET PHONE is currently secured at the Strafford County Sheriff's Office located at 259 County Farm Road, Dover, NH.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

### *Description of Information or Items to Be Seized*

I.     All records on the TARGET PHONE described in Attachment A, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 [Conspiracy to Distribute Controlled Substances], related to:

      A.     Evidence of who used, owned, or controlled the equipment;

      B.     Evidence of the user's past whereabouts;

      C.     The identities and aliases of individuals who participated in the violations listed above;

      D.     Lists of drug customers and related identifying information;

      E.     Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      F.     Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      G.     All bank records, checks, credit card bills, account information, and other financial records;

      H.     The locations where evidence or other items related to the violations listed above was obtained, is stored, or has been discarded;

      I.     The methods of communication between individuals engaged in the violations listed above, including the telephone numbers, messaging applications, and social media accounts used by the individuals;

      J.     The substance of communications regarding the planning, execution, transactions, and/or discussions of the violations listed above;

      K.     The substance of communications regarding the acquisition or disposal of items involved in the violations listed above;

      L.     The substance of communications regarding drugs, firearms, ammunition, and criminal street gang affiliation;

      M.     The substance of communications regarding money, vehicles, communications devices, or other items acquired during or for activity that would result in the violations listed above;

N.  Photographs of items or information related to the violations listed above;

O.  The relationship between the users of the equipment and other co-conspirators;

P.  The identity, location, and travel of users of the TARGET PHONE and any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the violations listed above;

Q.  Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

R.  Evidence of the attachment of other hardware or storage media;

S.  Evidence of counter-forensic programs and associated data that are designed to eliminate data;

T.  Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

U.  Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

V.  Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

II.  Evidence of user attribution showing who used or owned the TARGET PHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history

III.  Serial numbers and any electronic identifiers that serve to identify the equipment.

### *DEFINITIONS*

For the purpose of this warrant:

A.  "Equipment" means any hardware, software, storage media, and data.

B.  "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### *Return of Seized Equipment*

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.